NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

DEVON LATERRELL BEAN, *Appellant.*

Nos. 1 CA-CR 24-0373
1 CA-CR 24-0378
(Consolidated)
FILED 08-12-2025

Appeal from the Superior Court in Maricopa County
Nos. CR2021-002280-001
CR2022-134482-002
The Honorable Michael W. Kemp, Judge *Retired*

**AFFIRMED IN PART, VACATED IN PART AND REMANDED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Casey D. Ball
*Counsel for Appellee*

Maricopa County Office of the Legal Advocate, Phoenix
By Kyle Kinkead
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge Daniel J. Kiley delivered the decision of the Court, in which Presiding Judge Michael S. Catlett and Vice Chief Judge David D. Weinzweig joined.

---

**K I L E Y**, Judge:

¶1  A jury convicted Devon Bean of second-degree murder and aggravated assault. He then pled guilty to misconduct involving weapons ("MIW"), and his probation for a prior felony conviction was revoked. We vacate his convictions for second-degree murder and aggravated assault due to instructional error at trial, and affirm in all other respects.

## FACTS AND PROCEDURAL BACKGROUND

¶2  We view the facts and all reasonable inferences in the light most favorable to affirming Bean's convictions. *State v. Haywood*, 257 Ariz. 472, 475, ¶ 2 (App. 2024) (citation omitted).

¶3  In September 2022, Bean, his brother D.B., and an acquaintance, Q.M., all attended a Labor Day barbeque at the apartment complex where Q.M.'s girlfriend, T.M., lived. While speaking in T.M.'s apartment, Bean and Q.M. got into an argument which quickly grew heated. They stepped out of the apartment into the courtyard, where they continued to argue. Although D.B., too, was in the courtyard, his back was turned on the two men because he was grilling food.

¶4  Noticing that Bean kept touching the gun tucked in his waistband, Q.M. retrieved a gun from T.M.'s apartment and returned to the courtyard. The argument escalated until Bean drew his gun and fired at Q.M.

¶5  When Bean began shooting, Q.M. drew his gun and returned fire, striking Bean in the hand and leg. Hearing the commotion, D.B. turned and saw Q.M. shooting at his brother. Acting, as he later explained, to "save [his] brother's life," D.B. pulled out his own gun and shot at Q.M.

¶6  Several of the shots fired in Q.M.'s direction missed him and "shattered" the sliding glass door of the apartment behind him. The bullets struck and injured two young brothers who were sitting in the living room.

¶7            Bean was transported to the hospital, treated, and released. Q.M. did not survive. The medical examiner later testified that Q.M. died from "multiple gunshot wounds," including a shot through the neck that "tore" open the carotid artery and a second shot to the head that left a bullet fragment in his brain.

¶8            Bean's gun was "a Glock, .45 auto pistol," while D.B.'s was "a Smith & Wesson nine-millimeter Luger, semiautomatic pistol." A forensics firearms expert testified that the bullet fragment lodged in Q.M.'s brain was not fired from a Glock pistol; he could not determine whether it was fired from a Smith & Wesson 9-millimeter pistol. The bullet that lodged in Q.M.'s brain, in other words, did not come from Bean's gun, and so must have come from D.B.'s. The bullet that severed Q.M.'s carotid artery was never recovered, and so the source of that bullet could not be determined.

¶9            The State charged Bean with second-degree murder, a class 1 felony in violation of A.R.S. § 13-1104, and two counts of aggravated assault with a deadly weapon, class 3 felonies in violation of A.R.S. § 13-1204 in Maricopa County Superior Court Case No. CR2022-134482-002 (the "2022 case"). Because Bean was a prohibited possessor due to a prior felony conviction, he was also charged with MIW, a class 4 felony in violation of A.R.S. § 13-3102. The MIW count was later severed for trial.

¶10           The State charged D.B., who was also a prohibited possessor, with MIW. The State also charged him with tampering with physical evidence based on his attempt to dispose of his gun after the shootings. The State did not, however, charge D.B. for Q.M.'s death or the shooting of the two boys. As the prosecutor later explained, the State concluded that D.B. shot at Q.M. in defense of Bean, and therefore that his conduct was justified. *See* A.R.S. § 13-406 (justification; defense of a third person).

¶11           Trial began in November 2023. Throughout the trial, the State acknowledged that it could not prove which gunshots were fired by Bean and which by D.B. The State argued, however, that Bean was guilty of second-degree murder and aggravated assault because he recklessly initiated the exchange of gunfire that "caused" Q.M.'s death and the boys' injuries. Bean argued that he was not guilty because he shot at Q.M. in self-defense.

¶12           At trial, the State called the investigating detective and other officers who responded to the scene, the medical examiner, and a firearms expert as witnesses. The State also called the two boys who were shot in their apartment as well as T.M. and several other people who were present

at the Labor Day barbeque. The State presented video footage of the shooting obtained from the apartment complex's security camera. The video shows Bean engaged in an evidently heated conversation with Q.M. when he pulls the gun from his waistband, points it at Q.M., and begins shooting. The video shows Q.M. moving away from Bean and out of view of the camera. The video then shows D.B. coming into view and firing in Q.M.'s direction.

¶13        At the close of the State's case-in-chief, defense counsel moved for judgment of acquittal under Arizona Rule of Criminal Procedure ("Rule") 20 on the second-degree murder count, arguing there was no substantial evidence to support a conviction because the State did not prove that Bean "fire[d] the fatal shot."[1] In response, the State argued that no single gunshot killed Q.M., pointing out that the medical examiner determined that Q.M. died from the "culmination" of "multiple gunshot wounds." In any event, the State argued, whether Bean or D.B. fired the fatal shot was irrelevant. Because "it was [Bean] that started [the] interaction," the prosecutor concluded, "he was the cause of [Q.M.'s] death." The court denied Bean's Rule 20 motion.

¶14        Bean did not testify in his own defense. He called D.B. as a witness, who testified that he was grilling food at the party when he heard gunfire. He turned and saw the confrontation between Bean and Q.M., and so he pulled out his gun and shot at Q.M. "[t]o save [his] brother's life." Although he admitted that he did not see who started the confrontation between Q.M. and Bean, he indicated that he believed Q.M. to be dangerous, describing him as "hotheaded" and stating that Q.M. had once "bragged" about "shooting somebody."

¶15        The court instructed the jurors that they could convict Bean of second-degree murder based on Q.M.'s death if they found that the State proved beyond a reasonable doubt that,

> [u]nder circumstances manifesting extreme indifference to human life, the defendant recklessly engaged in conduct that created a grave risk of death and thereby caused the death of [Q.M.]. The risk must be such that disregarding it was a gross deviation from what a reasonable person in the defendant's situation would have done.

---

[1] Bean did not move for judgment of acquittal on the aggravated assault counts.

¶16        The court instructed the jurors that they could convict Bean of aggravated assault based on the gunshot injuries to the boys in the apartment if they found that the State proved beyond a reasonable doubt that "[t]he defendant committed an assault and . . . used a deadly weapon or dangerous instrument."[2]

¶17        At Bean's request, the court instructed the jurors on self-defense, justification in the use of deadly physical force, and justification in the use of force in crime prevention. *See* Rev. Ariz. Jury Instr. ("RAJI") Stand. Crim. 4.04 (self-defense), 4.05 (physical force), RAJI 4.11 (crime prevention) (6th ed. 2022).

¶18        The State's requested jury instructions included RAJI Standard Criminal 3.01, an instruction on accomplice liability. Defense counsel objected, arguing that Bean could not be criminally liable as D.B.'s accomplice because the State conceded that D.B. acted with justification in shooting at Q.M. The court overruled Bean's objection and instructed the jurors as follows:

> "Accomplice" means a person, who, with the intent to promote or facilitate the commission of the offense, does any of the following:
>
> 1. Solicits or commands another person to commit the offense; or
>
> 2. Aids, counsels, agrees to aid, or attempts to aid another person in planning or committing the offense; or
>
> 3. Provides means or opportunity to another person to commit the offense.
>
> A defendant is criminally accountable for the conduct of another if the defendant is an accomplice of such other person in the commission of the offense including any offense that is a natural and probable or reasonably foreseeable consequence of the offense for which the person was an accomplice.

A.R.S. § 13–301; RAJI Stand. Crim. 3.01.

---

[2] For the aggravated assault count against the younger of the two boys, the jury was also instructed that the offense could be established by evidence that he was under the age of 15. *See* A.R.S. § 13-1204(A)(6).

¶19          The court also gave the jurors the following instruction:

You must consider all these instructions. Do not pick out one instruction, or part of one, and ignore the others. As you determine the facts, however, you may find that some instructions no longer apply. You must then consider the instructions that do apply, together with the facts as you have determined them.

¶20          In closing argument, the State noted that Q.M. suffered multiple gunshot wounds, and acknowledged that it could not identify which of the gunshots killed him. The State argued, however, that even if the fatal shot was fired by D.B. and not Bean, Bean was nonetheless guilty of second-degree murder because, by "pointing a gun" and "shooting at" Q.M., he was responsible for the ensuing exchange of gunfire. Q.M.'s death, the prosecutor concluded, was "the result of actions that were caused by [Bean]," and therefore Bean "is responsible for [Q.M.'s] death." The State likewise argued even if bullets that struck the two boys in the apartment did not come from Bean's gun, their injuries were "still the result of actions that were caused by [Bean]." The State went on to rebut Bean's claim of self-defense, arguing that it was not supported by evidence.

¶21          In closing argument, defense counsel focused primarily on Bean's justification defense. Defense counsel also argued, however, that Bean could not be guilty of second-degree murder under any circumstances because the State failed to prove he fired the shot that killed Q.M. In all likelihood, counsel insisted, D.B., rather than Bean, fired the fatal shot, explaining that the firearms expert determined that the "projectile that was recovered from [Q.M.'s] brain" did not come from Bean's Glock. For similar reasons, defense counsel asserted, Bean was not "criminally responsible for what happened to" the two boys.

¶22          The jury found Bean guilty of second-degree murder and both counts of aggravated assault, and further found aggravating circumstances for each count. Shortly thereafter, Bean pled guilty to the severed MIW count.

¶23          The trial court sentenced Bean to a term of 20 years in prison for second-degree murder, concurrent terms of 4.5 years and 8 years, respectively, for MIW and one of the aggravated assault counts, and a consecutive term of 8 years for the remaining aggravated assault count.

¶24          At the time of the events giving rise to the 2022 case, Bean was on felony probation in Maricopa County Superior Court Case No. CR2021-

002280-001 (the "2021 case"). Based on the jury's verdicts in the 2022 case, the court revoked Bean's probation in the 2021 case and sentenced him to a concurrent term of 3.5 years in prison. *See* Ariz. R. Crim. P. 27.8(e) (providing for revocation of probation upon determination of guilt for another offense).

¶25 Bean filed timely notices of appeal. This Court has jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution and A.R.S. §§ 12-120.21, 13-4031, and -4033(A).

## DISCUSSION

¶26 On appeal, Bean challenges his convictions for second-degree murder and aggravated assault, asserting that the trial court erred in instructing the jury on accomplice liability. Whether the superior court erred in giving or refusing to give a requested instruction is reviewed for an abuse of discretion; whether an instruction accurately stated the law is reviewed de novo. *State v. Dann*, 220 Ariz. 351, 363-64, ¶ 51 (2009) (citations omitted). When considering a challenge to a jury instruction, a reviewing court "consider[s] the instructions in their entirety." *State v. Rix*, 256 Ariz. 125, 138, ¶ 43 (App. 2023) (citation omitted). A reviewing court "will not reverse a jury verdict based on an erroneous instruction unless the instructions, taken as a whole, could reasonably mislead a jury." *Id.* (citation omitted).

¶27 Arizona Revised Statutes Section 13-303 sets forth the circumstances in which a person may be criminally liable for a crime committed by another.[3] Because the State concedes that the shots that killed

---

[3] The statute provides,

  A. A person is criminally accountable for the conduct of another if:

    1. The person is made accountable for such conduct by the statute defining the offense; or

    2. Acting with the culpable mental state sufficient for the commission of the offense, such person causes another person, whether or not such other person is capable of forming the culpable mental state, to engage in such conduct; or

    3. The person is an accomplice of such other person in the commission of an offense including any offense that is a natural and probable or reasonably foreseeable consequence of the offense for which the person was an accomplice.

Q.M. and injured the two boys may have come from D.B.'s gun, Bean could be criminally liable for Q.M.'s death and the boys' injuries only as authorized by Section 13-303.

**¶28**        Bean argues that the court erred in instructing the jurors on accomplice liability under Subsection A(3) of Section 13-303, stating that the instruction lacked "evidentiary or legal support." The jurors could not properly find that he and his brother were accomplices to Q.M.'s death, Bean asserts, because the State presented "no evidence" that he ever "contemplated" that his brother would become "involve[d]" in his confrontation with Q.M. Moreover, Bean maintains, he could not possibly be an "accomplice" to D.B.'s conduct in firing his gun because, as the State conceded, D.B.'s conduct was justified. One cannot, he contends, be criminally liable as an "accomplice" to a lawful act.

**¶29**        In response, the State concedes that the evidence presented at trial would not support a finding that Bean was an "accomplice" as that term is statutorily defined. *See* A.R.S. § 13-301. Acknowledging that the court erred in giving the accomplice liability instruction, the State nonetheless asserts the error in giving the instruction was harmless.

**¶30**        Because Bean objected to the instruction that the State now concedes was erroneous, we review for harmless error. *State v. Moore*, 222 Ariz. 1, 14, ¶ 67 (2009) (citation omitted). Harmless error review "places the burden on the state to prove beyond a reasonable doubt that the error did not contribute to or affect the verdict." *State v. Strong*, 258 Ariz. 184, 200, ¶ 45 (2024) (quotation omitted).

**¶31**        In support of its assertion that instructing the jurors under the wrong subsection of Section 13-303 was harmless error, the State maintains that the erroneous accomplice liability instruction could not have affected the verdicts because the instruction was so obviously unsupported by

---

B. If causing a particular result is an element of an offense, a person who acts with the kind of culpability with respect to the result that is sufficient for the commission of the offense is guilty of that offense if:
    1. The person solicits or commands another person to engage in the conduct causing such result; or
    2. The person aids, counsels, agrees to aid or attempts to aid another person in planning or engaging in the conduct causing such result.
A.R.S. § 13-303.

evidence that the jurors would have had no trouble recognizing the instruction's inapplicability. "It defies common sense and logic," the State insists, "to conclude that jurors will come to a decision based on [a] theory that is not factually supported." In support of its position, the State cites case law recognizing that jurors are presumed to be capable of distinguishing between instructions that are supported by the evidence presented and instructions that are not. *See Griffin v. United States*, 502 U.S. 46, 59-60 (1991) (rejecting claim of due process violation based on trial court's instructing of the jury on two different legal theories of guilt, only one of which was supported by the evidence; "[T]he chance [is] remote . . . that the jury convicted on a ground that was not supported by adequate evidence when there existed alternative grounds for which the evidence was sufficient." (quotation omitted)); *State v. Fierro*, 254 Ariz. 35, 44-45, ¶¶ 35-36 (2022) (affirming conviction for attempted second-degree murder despite error in jury instruction, and "presum[ing]" that the jury followed "the correct language in" the jury instruction defining the offense and "disregarded the erroneous parts"); *State v. Malaga*, 132 P.3d 703, 709, ¶ 15 (Utah Ct. App. 2006) (holding that because "the State never pursued . . . the theory of accomplice liability at trial," the accomplice liability instruction "was superfluous" and caused no prejudice to defendant (citation modified)). "[A] verdict should not be vacated," the State contends, merely because "a factually unsupported theory [was] submitted to the jury along with factually supported theories."

**¶32**        We are not persuaded. Accomplice liability is a legal theory of liability, and courts do not presume that jurors recognize and disregard instructions that set forth incorrect or inapplicable legal theories. *Griffin*, 502 U.S. at 59 ("Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law."; "When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error."). On the contrary, because courts presume that jurors "follow[] their instructions," *State v. Dann*, 220 Ariz. at 366, ¶ 75 (citations omitted), we cannot simply assume that the jurors disregarded the erroneous accomplice liability instruction. Moreover, the presumption that jurors will recognize and reject an inapplicable instruction in favor of a correct one cannot possibly apply when, as here, the jurors are given only a single vicarious liability instruction and that instruction is wrong. *See Leon v. Marner*, 244 Ariz. 465, 470, ¶ 13 (App. 2018) (reversing defendant's conviction based on erroneous instruction "[b]ecause no other instruction offered an alternative means of convicting [defendant]").

¶33 The State goes on to assert that the error in giving the accomplice liability instruction "did not contribute to the jury's verdict" because at trial the State proceeded on "a valid legal theory" that was "supported by substantial evidence." Specifically, the State asserts, the prosecutor argued at trial that Bean "caused" Q.M.'s death because, "through his reckless conduct in firing the gun at [Q.M.]," Bean "set[] in motion [D.B.'s] reasonably foreseeable reaction" in "com[ing] to [Bean's] defense." D.B.'s "actions," the State argues, "were a reasonably foreseeable consequence of [Bean's] actions," and so "did not break the causal chain." The prosecutor's theory of liability at trial, the State goes on, was consistent with Subsection A(2) of Section 13-303. *See* A.R.S. § 13-303(A)(2) ("A person is criminally accountable for the conduct of another if . . . [a]cting with the culpable mental state sufficient for the commission of the offense, such person causes another person . . . to engage in such conduct."). Because the legal theory the prosecutor asserted at trial was a valid theory of vicarious liability under Section 13-303, the State concludes, Bean's convictions should be affirmed.

¶34 We are unpersuaded by the State's argument that Bean's convictions should be affirmed because Subsection A(2) established a proper legal basis for holding him liable for his brother's actions. Whether Bean could properly be held liable under Subsection A(2) is a question for the jury to resolve at trial, not for an appellate court to determine for the first time on appeal. *See McCormick v. United States*, 500 U.S. 257, 270 n.8 (1991) ("Appellate courts are not permitted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury."). The jurors were never instructed under Subsection A(2), nor were they instructed on the "causation" principles on which that subsection is based. *See* RAJI Stand. Crim. 2.03.03 (Causation – Multiple Actors); 2.03 (Causation – Intervening Event). Because the jurors were never instructed under Subsection A(2), we cannot presume to know what their verdict would have been if they had been. *See Commonwealth v. Mills*, 764 N.E.2d 854, 864-65 (Mass. 2002) (reversing larceny conviction even though evidence could have supported a conviction under a theory of larceny by false pretenses because jury was instructed only on elements of traditional larceny).

¶35 The State asserts, in a cursory manner, that "the absence of an instruction" under Subsection A(2) of Section 13-303 "did not prejudice" Bean because "the jury was properly instructed on the elements of second-degree murder." Noting that the second-degree murder instruction required the jury to find, *inter alia*, that Bean "caused the death of [Q.M.]," the State suggests that the second-degree murder instruction adequately

informed the jurors of the "[c]ausation" principles that they would have learned had they been instructed under Subsection A(2).

¶36            Because the second-degree murder statute, A.R.S. § 13-1104, does not, by itself, provide for vicarious liability, we see no basis for the State's suggestion that the second-degree murder instruction somehow served as an adequate substitute for a vicarious liability instruction under Section 13-303. We therefore reject the State's position that the error in instructing the jury under Subsection A(3) of Section 13-303 was harmless because the jurors could have properly convicted Bean under Subsection A(2) had they been instructed on that statute. *See Dunn v. United States*, 442 U.S. 100, 107 (1979) ("[A]ppellate courts are not free to revise the basis on which a defendant is convicted simply because the same result would likely obtain on retrial.").

¶37            To hold Bean liable for his brother's conduct, the State was required to establish a basis for vicarious liability under Section 13-303. The State concedes that the jury was instructed under Subsection A(3) when it shouldn't have been, and that the jury should have been instructed under Subsection A(2) but wasn't. Because the remaining instructions did not adequately set forth the relevant principles for establishing vicarious liability under Section 13-303, we reverse Bean's convictions for second-degree murder and aggravated assault and remand for a new trial.

¶38            Bean also raises the alternative argument that the jury's verdicts should be set aside because the court erred in dismissing a particular prospective juror for cause. Because we set aside Bean's convictions due to instructional error, we need not address his alternative challenge to his convictions.

¶39            Bean does not challenge his MIW conviction in the 2022 case, which resulted from his post-trial guilty plea. We therefore affirm his MIW conviction. And because his MIW conviction in the 2022 case establishes a proper basis for the revocation of Bean's probation in the 2021 case, we affirm the revocation of his probation as well. Ariz. R. Crim. P. 27.8(e).

## CONCLUSION

**¶40**        Based on the foregoing, we vacate Bean's convictions and sentences for second-degree murder and aggravated assault in the 2022 case. We affirm his MIW conviction in that case and the revocation of his probation in the 2021 case, and remand for further proceedings consistent with this decision.



MATTHEW J. MARTIN • Clerk of the Court
**FILED**:            JR